**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| EMILY FRENKEL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>BAYLOR MIRACA GENETICS LABORATORIES LLC d/b/a BAYLOR GENETICS, and NATERA, INC.,<br><br>Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Emily Frenkel ("Plaintiff"), individually and on behalf of all others similarly situated (members of the Class and New York Statutory Sub-Class, as defined below), by and through her attorneys, brings this Class Action Complaint against Defendants Baylor Miraca Genetics Laboratories, LLC d/b/a Baylor Genetics ("Baylor Genetics") and Natera, Inc. ("Natera") (collectively, "Defendants"), and alleges as follows based upon personal knowledge as to herself, investigations by Plaintiff's counsel, facts of public record, and information and belief:

## NATURE OF THE ACTION

1. Plaintiff brings this action against Defendants for their failure to secure and safeguard the personally identifiable information ("PII") and personal health information ("PHI") (collectively, "Personal Information") of patients and certain current and former employees, including names, dates of birth, medical testing information, laboratory test results, health insurance information, Social Security numbers, government-issued identification numbers, and financial account information.

2. Baylor Genetics is a private clinical diagnostic laboratory that specializes in comprehensive genetic testing services, including whole-exome sequencing, prenatal diagnostics, cytogenetics, molecular diagnostics, oncology and interpretation services.

3. Natera is a public diagnostics company that engages in the development and commercialization of molecular testing services worldwide. Upon information and belief, in the course of its business, Natera contracts or partners with specialized laboratories like Baylor Genetics to process or interpret specific genetic testing panels of its patients.

4. Between approximately June 11, 2026, and June 17, 2026, an unauthorized third party gained access to Baylor Genetics' network systems and certain data stored on the company's network, containing the Personal Information of Baylor Genetics' patients[1] and current and former employees (the "Data Breach").

5. In particular, Baylor Genetics advised, that for the impacted patients, the Personal Information involved in the Data Breach, included, *inter alia*, names, dates of birth, medical testing information, laboratory test results, health insurance information, and Social Security numbers. Baylor Genetics further advised that. for the impacted current or former employees, the Personal Information involved in the Data Breach, included, *inter alia*, Social Security numbers, government-issued identification numbers, and financial account information.

6. Defendants owed a duty to Plaintiff and other class members, as part of the Defendants' medical-testing services or course of employment, to implement and maintain reasonable security measures, to safeguard the Plaintiff's and other class members' Personal Information entrusted to Defendants' care. Defendants breached that duty by, among other things,

[1] A number of Baylor Genetics' patients were also patients of Natera. Upon information and belief, Natera shared the Personal Information of its patients with Baylor Genetics in the course of its operations for purposes of providing medical-testing services.

failing to implement and maintain adequate security procedures and practices to protect the class members' Personal Information from unauthorized access and disclosure.

7. As a result of Defendants' inadequate security measures and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and class members' Personal Information was compromised. This action seeks to remedy Defendants' failures and the damages sustained by Plaintiff and other class and sub-class members as a result thereof. Plaintiff brings this action on behalf of herself and all persons whose Personal Information was exposed as a result of the Data Breach.

8. Plaintiff, on behalf of herself and all other class and sub-class members, asserts claims for negligence, negligence *per se*, breach of fiduciary duty, breach of implied contract, unjust enrichment, and statutory breaches, and seeks declaratory relief, monetary damages, statutory damages, equitable relief, and all other relief authorized by law.

## PARTIES

9. Plaintiff is a resident of New York, New York.

10. Defendant Baylor Genetics is a Texas limited liability company, with its principal place of business located at 2450 Holcombe Blvd., Ste. 104, Houston, Texas 77021.

11. Defendant Natera is a Delaware corporation, with its principal executive offices located at 13011 McCallen Pass, Building A, Suite 100, Austin, Texas 78753.

## JURISDICTION AND VENUE

12. This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this action is brought as a class action on behalf of more than 100 proposed Class members, at least one proposed Class member is a citizen of a state different from at least one Defendant, and the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

13. The Court has personal jurisdiction over Defendant Baylor Genetics because it is a Texas limited liability company, has its principal place of business in Texas, and regularly conducts substantial business in Texas.

14. This Court has personal jurisdiction over Defendant Natera because it is headquartered in Texas and regularly conducts substantial business in Texas. Among other things, Natera operates laboratories, including in Austin, Texas, that are certified under the Clinical Laboratory Improvement Amendment of 1988 ("CLIA"), providing molecular testing services.

15. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because a significant part of the events leading to the claims asserted herein emanated from activities within this District, and Defendants conduct substantial business in this District.

## FACTUAL ALLEGATIONS

### A. Background

16. According to its public filings, Natera focuses on three main areas of healthcare: oncology, women's health, and organ health.[2] In oncology, Natera commercializes personalized, blood-based DNA tests. In the women's health space, Natera develops and commercializes non- or minimally invasive tests, from prenatal testing to hereditary cancer screening. In organ health, Natera offers tests to assess kidney, heart, and lung transplant rejection, as well as genetic testing for chronic kidney disease.

---

[2] *See* Natera's Form 10-Q, filed August 7, 2026, at 10, *available at* www.sec.gov/ix?doc=/Archives/edgar/data/0001604821/000162828026054525/ntra-20260630.htm#fact-identifier-493 (last accessed October 8, 2026).

17. As noted above, upon information and belief, in the course of its business, Natera contracts or partners with specialized laboratories like Baylor Genetics to process or interpret specific genetic testing panels.

18. Baylor Genetics "offer[s] a full spectrum of comprehensive genetic tests and diagnostic services, from clinical-grade genomic sequencing to expert interpretation, including Whole Genome Sequencing, Whole Exome Sequencing, and focused panels."[3] Baylor Genetics is "[l]ocated in Houston's Texas Medical Center," and "serves clients in 50 states."[4]

19. In the course of their regular business operations, Defendants collect, transmit, and maintain the Personal Information of their patients and current and former employees.[5] Defendants required Plaintiff and other Class members to provide their Personal Information, as a condition of providing them with healthcare services or employment.

20. Plaintiff underwent genetic laboratory testing ordered by her physician, as part of pre-natal care. Specifically, the Plaintiff's healthcare provider ordered the Vistara prenatal screen ("Vistara") offered by Natera. The Vistara test identifies probability for conditions that may have otherwise gone undetected until after birth. The description of Vistara, provided on Natera's website, references Baylor Genetics in connection with validation data for this test.[6]

21. Plaintiff was required to provide her Personal Information to obtain the Vistara laboratory test, which was performed on April 8, 2025.

---

[3] *See* www.baylorgenetics.com/partners (last accessed October 8, 2026).

[4] *Id*.

[5] Plaintiff is not currently aware of the precise manner or mechanism by which Defendants collected, processed, shared, transmitted, and stored the Personal Information of Plaintiff and other class and sub-class members. That will be the subject of any upcoming discovery in this action.

[6] *See* www.natera.com/wp-content/uploads/2020/11/Womens-Health-Patient-Vistara-non-invasive-prenatal-screen.pdf (last accessed October 8, 2026).

22. Accordingly, Defendants obtained, processed, shared, and stored Plaintiff's Personal Information, in connection with the Vistara test ordered by Plaintiff's healthcare provider.

23. Natera's website features a HIPAA Notice of Privacy Practices ("Natera Privacy Policy"), that describes how Natera may use and disclose its patients' Personal Information. Natera advises, *inter alia*, that "[u]nder HIPAA, Natera is required by law to maintain the privacy of health information that identifies you, called protected health information (PHI)," and that "[p]rotecting the privacy of PHI is an important part of Natera's business, and we are committed to ensuring your confidentiality."[7]

24. Baylor Genetics' website likewise features a HIPAA Notice of Privacy Policies ("Baylor Genetics Privacy Policy") that describes how Baylor Genetics may use and disclose its patients' Personal Information. Baylor Genetics advises, *inter alia*, that it "has specific duties regarding your medical information," "understand[s] that medical information about you and your health is personal," and is "committed to protecting medical information about you."[8] Baylor Genetics further advises that it is "required by law to maintain the privacy and security of your protected medical information."[9] Additionally, Baylor Genetics represents that "[w]e will let you know promptly if a breach occurs that may have compromised the privacy or security of your information."[10]

**B. The Data Breach**

25. According to the notice of the Data Breach published by Baylor Genetics, between approximately June 11, 2026, and June 17, 2026, an unauthorized third party purportedly gained

---

[7] *See* www.natera.com/notice-of-privacy-practices (last accessed October 8, 2026).

[8] *See* www.baylorgenetics.com/privacy-practices (last accessed October 8, 2026).

[9] *Id.*

[10] *Id.*

access to Baylor Genetics' network systems, which Baylor Genetics only discovered on or around June 15, 2026.[11] As such, Baylor Genetics did not even discover the Data Breach until four days after it first took place and allowed the unauthorized intruders to remain in its network systems for approximately a week.

26. After a review completed on or about July 30, 2026, Baylor Genetics determined that the data compromised through the Data Breach included the Personal Information of its patients and current and former employees. In particular, the Personal Information affected in the Data Breach included the patients' names, dates of birth, medical testing information, laboratory test results, health insurance information, and Social Security numbers, as well as the current and former employees' Social Security numbers, government-issued identification numbers, and financial account information.[12]

27. Two months after the Data Breach had occurred, Baylor Genetics sent Plaintiff and other affected persons notice of the Data Breach on or around August 14, 2026 ("Data Breach Notice"), attached as Exhibit A. The Data Breach Notice advised Plaintiff and others whose Personal Information was compromised in the Data Breach "to review your account statements, Explanation of Benefits statements, and credit reports for any unusual activity."[13]

### C. Defendants Knew That They Possessed Highly Targeted Personal Information Prior to the Data Breach

28. At all relevant times, Defendants knew, or should have known, that the Personal Information that they collected, processed, shared, and stored was a high-value target for malicious

---

[11] *See* Baylor Genetics' Security Update, *available at* www.baylorgenetics.com/securityupdate (last accessed October 8, 2026).

[12] *Id.*

[13] *See* Ex. A.

actors. Despite such knowledge, Defendants failed to implement and maintain reasonable data privacy and security measures to protect Plaintiff's and class members' Personal Information from cyberattacks that they should have anticipated and guarded against.

29. It is well known among companies doing business in the healthcare sector, such as Defendants, that sensitive personal and medical information is very valuable and frequently targeted by cybercriminals. It is in fact so valuable to identity thieves, that once Personal Information has been disclosed, criminals then trade it on the black-market or so-called "dark web" for many years to come.

30. Among other things, criminals can bundle together bits and pieces of compromised Personal Information in so-called "Fullz" packages and sell them for profit. Fullz usually contains a person's name, address, Social Security number, driver's license, bank account credentials, and medical records, among other details. Identity thieves use the victim's financial reputation for identity theft and fraud, resulting in low credit scores and financial insecurity for the victims. For example, criminals can apply for a loan or credit card with the victim's good credit. The fraudster applies for the card and uses it, while the victim cannot pay it off and/or attempts to cancel it, harming their credit score.

31. The development of "Fullz" packages means that, even if certain information (such as contact information) may not have been included in the Personal Information that was exfiltrated in the Data Breach, criminals can still put together a Fullz package and sell it on the dark web to other criminals, time and time again.

32. PHI, including that compromised in the Data Breach, is particularly valuable to criminals. In 2023 alone, over 133 million patient records were exposed in healthcare-related

breaches, according to the U.S. Department of Health and Human Services.[14] This number highlights just how heavily targeted PHI has become—especially on the dark web.

33. In fact, PHI is not just about medical records—it is a trove of personal, financial, and health data, often stored together in a single digital file. This level of detail is a goldmine for cybercriminals, fueling a black market where complete patient profiles can fetch hundreds of dollars apiece. According to industry research, a single medical record can sell for $250–$1,000, far surpassing the value of stolen credit cards. John Riggi, the National Advisor for Cybersecurity and Risk for the American Hospital Association, explained in his April 2, 2025 post that "[t]he primary reason for this is that health care records have *enduring* value."[15] In other words, "[u]nlike a credit card number, a patient cannot change their health care records."[16] As such, PHI offers long-term, reusable value, making it an enduring commodity on the dark web. Unsurprisingly then, according to a 2025 report by Kroll, "the healthcare industry was the most breached" industry in 2024.[17]

34. Accordingly, Defendants, doing business in the healthcare space involving genetic-testing, knew or should have known prior to the Data Breach, that because cybersecurity threats were on the rise, proper security measures were required to be put in place to prevent unauthorized access to the Personal Information in their custody and care.

---

[14] *See* Ken Alltucker, "Health care data breaches hit 1 in 3 Americans last year: Is your data vulnerable?," *USA Today* (Feb. 18, 2024), *available at* www.usatoday.com/story/news/health/2024/02/18/health-data-breaches-hit-new-record-2023/72507651007 (last accessed October 8, 2026).

[15] Available at www.aha.org/news/aha-cyber-intel/2025-04-03-3-must-know-cyber-and-risk-realities-whats-ahead-health-care-2025 (last accessed October 8, 2026).

[16] *Id.*

[17] *See* www.kroll.com/en/publications/cyber/data-breach-outlook-2025 (last accessed October 8, 2026).

**D. Defendants Knew That Unauthorized Access to Personal Information Has Serious Consequences for Victims**

35. Defendants knew or should have known that unauthorized access to Personal Information poses serious and long-lasting dangers to the victims of a data breach. The Federal Trade Commission ("FTC") has cautioned that identity thieves use Personal Information to, *inter alia*, make purchases with the victim's credit cards, open new credit card accounts in the victim's name, open a phone, electricity, or gas accounts in the victim's name, steal the victim's tax refund, get a job or medical care in the victim's name, or pretend to be the victim if they're arrested.[18]

36. The consequences of compromised Personal Information are particularly dire when, as here, that Personal Information includes PHI. As the FTC warns with regard to medical identity theft, an identity thief may use Personal Information "to get medical care, see a doctor, get prescription drugs, buy medical devices, or submit claims with your insurance provider."[19] What is more, as the FTC has explained, "[i]f the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use… It could also hurt your credit."[20]

**E. Defendants Failed to Comply with FTC Data-Security Guidance**

37. The FTC has long recognized that businesses, such as Defendants, that collect and maintain sensitive personal information must implement reasonable and appropriate measures to protect that information from unauthorized access and disclosure.

---

[18] *See* https://consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed October 8, 2026).

[19] *Id.*

[20] *Id.*

38. The FTC has concluded that a company's failure to maintain reasonable security for consumers' sensitive personal information may constitute an unfair practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

39. Accordingly, the FTC has issued a number of guidelines identifying best data security practices that businesses, such as Defendants, should follow to safeguard the Personal Information in their possession and control.

40. In this regard, the FTC has advised that businesses should "[p]rotect the information [they] keep, and properly dispose of what [they] no longer need."[21] Additionally, the FTC has instructed businesses such as Defendants to "create a plan to respond to security incidents."[22]

41. Among other things, the FTC has also directed businesses that maintain personally identifying information to, *inter alia*, restrict access to sensitive data, limit administrative access, require secure passwords and authentication, continuously validate access to data, monitor activity on the business network, verify that privacy and security features are in working order, test for common vulnerabilities, ensure that service providers implement reasonable security measures, update and patch third-party software, verify compliance, securely store sensitive files, keep safety standards in place when data is *en route*, dispose of sensitive data securely, and keep sensitive information secure throughout its lifecycle.[23]

42. Here, Natera has collected and maintained Plaintiff's and other class members' Personal Information as part of its medical-testing services. On information and belief, Natera has shared that Personal Information with Baylor Genetics.

---

[21] *See* www.ftc.gov/business-guidance/resources/start-security-guide-business (last accessed October 8, 2026).

[22] *Id.*

[23] *Id.*

43. Natera therefore had a duty to exercise reasonable care, not only in securing the systems and information directly under its control, but also in selecting and monitoring Baylor Genetics, to whom it entrusted patients' medical information, and in requiring Baylor Genetics to maintain safeguards appropriate for such highly sensitive information.

44. Baylor Genetics, in turn, had a duty to implement reasonable security measures to protect the Personal Information it obtained and maintained in connection with providing its medical-testing services to patients or employment to its current and former employees.

45. Defendants knew or should have known about the FTC's data-security guidelines and the need to implement proper safeguards to protect the Personal Information in their possession and control.

46. Defendants' failure to adequately protect Plaintiff's and class members' Personal Information, including their failure to establish adequate security controls, was inconsistent with the appropriate data-security practices identified by the FTC.

**F. Defendants Failed to Comply with HIPAA and HITECH Requirements**

47. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations have established strict standards for managing, transmitting, and storing protected PHI.

48. Defendants are each a covered business under HIPAA (45 C.F.R. § 160.102) and thus required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E; and the HIPAA Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C.

49. As such, Defendants must "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually

identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

50. Under HIPAA's Security Rule, Defendants are required to:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted or required; and

d. Ensure compliance by its workforce.

45 C.F.R. § 164.306(a).

51. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Defendants must also "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

52. HIPAA further requires Defendants to have procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. *See* 45 C.F.R. § 164.306(a)(1), (a)(3).

53. Moreover, HIPAA requires covered entities like Defendants to apply appropriate sanctions against members of their respective workforces who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

54. Furthermore, HIPAA requires covered entities like Defendants to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E, by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

55. Defendants are also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 45 C.F.R. § 160.103.

56. Because Defendants collected, processed, shared, transmitted, and stored PHI in connection with their medical-testing services, they were required under HIPAA and HITECH to maintain appropriate security measures to protect that information.

57. To the extent Natera entrusted Plaintiff's and other class members' PHI to Baylor Genetics to perform laboratory services in connection with Defendants' medical-testing business, Natera remained obligated to exercise reasonable care in selecting, contracting with, transmitting information to, and overseeing Baylor Genetics, to which it entrusted patient information.

58. To the extent Baylor Genetics obtained Plaintiff's PHI, as a covered entity, Baylor Genetics was obligated to safeguard that information against unauthorized access and disclosure.

59. As alleged herein, Defendants failed to comply with their respective HIPAA duties. In particular, Defendants failed to maintain adequate security practices, systems, and protocols to prevent the compromise of Plaintiff's and class members' Personal Information, failed to mitigate the risks of a data breach, and failed to ensure the confidentiality and protection of Plaintiffs' and class members' Personal Information, including their PHI.

### G. Plaintiff's Experience and Damages Sustained by Plaintiff and Class Members

60. Plaintiff is very careful about sharing her sensitive Personal Information. Plaintiff stores any documents containing her Personal Information in a safe and secure location. Plaintiff would not have entrusted her Personal Information, including her genetic information, to Defendants had she known about their lax data security policies and practices.

61. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including monitoring her bank and credit card accounts. Plaintiff has spent significant time dealing with the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work and/or family time.

62. Plaintiff will continue to spend considerable time and effort monitoring her accounts to protect herself from identity theft. Plaintiff fears for her personal financial security and uncertainty over what Personal Information was exposed, including her genetic information.

63. Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her Personal Information being placed in the hands of unauthorized third parties. This injury is worsened by Defendants' failure to promptly notify Plaintiff about the Data Breach.

64. Defendants' failure to promptly notify Plaintiff and class members that their Personal Information was wrongfully accessed virtually ensured that the unauthorized third parties who exploited the Defendants' security lapses, could monetize, misuse, or disseminate that Personal Information before Plaintiff and other class members could take steps to protect their sensitive information. As a result, Plaintiff and other class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

65. Plaintiff and other class members have a continuing interest in ensuring that their Personal Information, which upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

66. As a direct and proximate result of Defendants' acts and omissions, Plaintiff and other class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, disclosure, and theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Personal Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Personal Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Personal Information compromised as a result of the Data Breach; and (vii) overpayment for services that were received or labor provided, without adequate data security.

## CLASS ACTION ALLEGATIONS

67. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

68. Plaintiff brings this action on behalf of herself and all members of the following nationwide class and state sub-class of similarly situated persons:

> **Class**: All persons whose personally identifiable information or personal health information was compromised in the Data Breach, including all persons who were sent a notice of the Data Breach.

69. In addition to the Class, Plaintiff brings this action on behalf of herself and all members of the following Sub-Class:

> **New York Statutory Sub-Class**: All persons residing in New York state, whose personally identifiable information or personal health information was compromised in the Data Breach, including all persons who were sent a notice of the Data Breach.

70. Excluded from the Class and the New York Statutory Sub-Class are Defendants Baylor Genetics and Natera, and their respective affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

71. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence that would be used to prove those elements in individual actions alleging the same claims.

72. The members of the Class and the New York Statutory Sub-Class are so numerous that joinder of each of these members in a single proceeding would be impracticable. Baylor Genetics informed the U.S. Department of Health and Human Services Office for Civil Rights that over 2.8 million people were affected by the Data Breach.[24] Baylor Genetics also reported to the Texas Attorney General that the Data Breach affected 248,430 Texans, to the Massachusetts Attorney General that the Data Breach affected 56,636 residents, and to the Vermont Attorney General that the Data Breach affected 2,630 residents, and stated in its Security Update that 4,532 Rhode Island residents were affected.[25]

---

[24] *See* https://ocrportal.hhs.gov/ocr/breach/breach_report_hip.jsf (last accessed Oct. 7, 2026).

[25] The exact number and identities of Class and New York Statutory Sub-Class members are known to Defendants and can be determined from their records.

73. Common questions of law and fact exist as to all Class and New York Statutory Sub-Class members and predominate over any potential questions affecting only individual Class and New York Statutory Sub-Class members. Such common questions of law or fact include, *inter alia*:

(a) whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class/New York Statutory Sub-Class members' Personal Information from unauthorized access;

(b) whether Defendants failed to exercise reasonable care to safeguard Plaintiff's and Class/New York Statutory Sub-Class members' Personal Information;

(c) whether Defendants breached their duties to protect Plaintiff's and Class/New York Statutory Sub-Class members' Personal Information; and

(d) whether Plaintiff and Class/New York Statutory Sub-Class members are entitled to damages and the appropriate measure of such damages and relief.

74. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class/New York Statutory Sub-Class members. Individual questions, if any, pale in comparison to the numerous common questions that dominate this action.

75. Plaintiff's claims are typical of the claims of the Class/New York Statutory Sub-Class. Plaintiff, like all proposed members of the Class and New York Statutory Sub-Class, had her Personal Information compromised in the Data Breach. Plaintiff and Class/New York Statutory Sub-Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class/New York Statutory Sub-Class members.

76. Plaintiff will fairly and adequately protect the interests of the Class/New York Statutory Sub-Class members. Plaintiff is an adequate representative of the Class and New York Statutory Sub-Class in that she has no interests adverse to, or that conflict with, the Class and New York Statutory Sub-Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

77. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class/New York Statutory Sub-Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class/New York Statutory Sub-Class members to individually seek redress from Defendants' wrongful conduct. Further, individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### COUNT I
### Negligence
### (On Behalf of Plaintiff and the Class Against All Defendants)

78. Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

79. Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding the Personal Information in their possession, custody, or control.

80. Defendants knew or should have known about the risks of collecting and storing Plaintiff's and all other Class members' Personal Information and the importance of maintaining secure IT systems. Defendants knew or should have known of the many data breaches that targeted healthcare providers that collect and store PHI in recent years.

81. Defendants knowingly collected, processed, shared, transmitted, and stored Plaintiff's and Class members' Personal Information in connection with their medical-testing services.

82. Given the nature of the Defendants' medical-testing business, the sensitivity and value of the Personal Information they maintain, and the resources at their disposal, Defendants should have each identified the vulnerabilities to their respective practices and systems, and prevented the Data Breach from occurring.

83. Defendants breached these duties by failing to exercise reasonable care in safeguarding Plaintiff's and Class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, software and hardware systems to safeguard the Personal Information entrusted to them, including that of Plaintiff and other Class members.

84. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding Plaintiff's and Class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, software and hardware systems would result

in the unauthorized access to, disclosure of, and dissemination of Plaintiff's and Class members' Personal Information to unauthorized individuals.

85. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their Personal Information would not have been compromised.

86. As a result of Defendants' above-described wrongful actions, inaction, and lack of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, disclosure, and theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Personal Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Personal Information compromised as a result of the Data Breach; and (vii) overpayment for the services that were received or labor that was provided, without adequate data security.

87. Plaintiff seeks to remedy these harms and to prevent the future occurrence of an additional data breach on behalf of herself and the Class. Plaintiff seeks, *inter alia*, compensatory damages on behalf of herself and the Class for loss of time, opportunity costs, out-of-pocket costs, and injunctive relief including improvements to Defendants' data security systems and protocols, future annual audits, and adequate credit monitoring services funded by Defendants.

88. Accordingly, Plaintiff and Class members are entitled to damages, including compensatory, consequential, punitive, and nominal damages, to be determined at trial. Plaintiff and Class members are also entitled to injunctive relief, requiring Defendants to (a) strengthen their data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) provide adequate lifetime credit monitoring to Plaintiff and all Class members.

**COUNT II**
**Negligence *Per Se***
**(On Behalf of Plaintiff and the Class Against All Defendants)**

89. Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

90. Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E; the HIPAA Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules"); and HITECH, 45 C.F.R. § 160.103.

91. Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(l), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure Personal Information.

92. Defendants violated HIPAA Privacy and Security Rules, HITECH, and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class members' Personal Information and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and quantity of Personal Information they obtain and store, and the foreseeable consequences of a data breach involving

Personal Information, including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

93. Defendants' violations of HIPAA Privacy and Security Rules, HITECH, and Section 5 of the FTCA constitute negligence *per se*.

94. Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules, HITECH, and Section 5 of the FTCA were intended to protect.

95. The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules, HITECH, and Section 5 of the FTCA were intended to guard against.

96. It was, or should have been, reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding Plaintiff's and Class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, software and hardware systems would result in the unauthorized access to, disclosure, and dissemination of Plaintiff's and Class members' Personal Information to unauthorized individuals.

97. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules, HITECH, and Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, disclosure, and theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Personal which remains in Defendants' possession;

(vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Personal Information compromised as a result of the Data Breach; and (vii) overpayment for the services that were received or labor that was provided, without adequate data security.

98. Accordingly, Plaintiff and Class members are entitled to damages, including compensatory, consequential, punitive, and nominal damages, to be determined at trial. Plaintiff and Class members are also entitled to injunctive relief, requiring Defendants to (a) strengthen their data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) provide adequate lifetime credit monitoring to Plaintiff and all Class members.

**COUNT III**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class Against All Defendants)**

99. Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

100. Plaintiff and Class members provided Defendants with their Personal Information in confidence, believing that Defendants would protect that information. Plaintiff and Class members would not have provided Defendants with this information had they known it would not be adequately protected. Defendants' acceptance and storage of Plaintiff's and Class members' Personal Information created a fiduciary relationship between Defendants, on the one hand, and Plaintiff and Class members on the other. In light of this relationship, Defendants must act primarily for the benefit of their patients and employees, which includes safeguarding Plaintiff's and Class members' Personal Information.

101. Due to the nature of the relationship between Defendants, on the one hand, and Plaintiff and Class members, on the other, Plaintiff and Class members were entirely reliant on Defendants to ensure that their Personal Information was adequately protected. Plaintiff and Class members had no way of verifying or influencing Defendants' data security policies and practices, and Defendants were in an exclusive position to guard against the Data Breach.

102. Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. Defendants breached that duty by, *inter alia*, failing to have appropriate security practices in place and to protect the integrity of the system containing Plaintiff's and Class members' Personal Information, failing to comply with the data security guidelines set forth by HIPAA, HITECH, and the FTC, and otherwise failing to safeguard Plaintiff's and Class members' Personal Information that they collected and stored.

103. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, disclosure, and theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Personal Information; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Personal Information which remains in the Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Personal Information compromised as a result of the Data Breach; and (vii) overpayment for the services that were received or labor that was provided, without adequate data security.

104. Accordingly, Plaintiff and Class members are entitled to damages, including compensatory, consequential, punitive, and nominal damages, to be determined at trial. Plaintiff and Class members are also entitled to injunctive relief, requiring Defendants to (a) strengthen their data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) provide adequate lifetime credit monitoring to Plaintiff and all Class members.

**COUNT IV**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class Against All Defendants)**

105. Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

106. In connection with receiving healthcare services or employment, Plaintiff and all other Class members entered into implied contracts with Defendants.

107. Pursuant to these implied contracts, Plaintiff and Class members, among other things, provided labor to Baylor Genetics as employees, or paid money to Defendants as their patients, directly or through their insurance, and provided Defendants with their Personal Information. In exchange, Defendants agreed to, among other things, and Plaintiff and Class members understood that Defendants would: (1) provide healthcare services or employment to Plaintiff and Class members that would entail appropriate data security measures during the course of their treatment or employment; (2) collect, maintain, and utilize Plaintiff's and Class members' Personal Information to, among other things, facilitate their employment or the provision of healthcare services to Plaintiff and Class members; (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' Personal Information; (4) protect Plaintiff's and Class members' Personal Information in compliance with federal and state laws,

regulations, industry standards, and Defendants' representations; and (5) maintain the confidentiality of Plaintiff's and Class members' Personal Information, and protect it from unauthorized access, disclosure, theft, and misuse.

108. The protection of Personal Information was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Defendants, on the other hand. Had Plaintiff and Class members known that Defendants would not adequately protect their patients' or employees' Personal Information, they would not have agreed to provide Defendants with their Personal Information, or received healthcare services from Defendants, or sought employment with Baylor Genetics.

109. Plaintiff and Class members performed their obligations under the implied contract when they provided Defendants with their Personal Information and provided their labor or paid—directly or through their insurers—for healthcare services from Defendants.

110. Defendants breached their obligations under their implied contracts with Plaintiff and Class members by failing to implement and maintain reasonable security measures to protect their Personal Information, and by failing to implement and maintain reasonable security protocols and procedures to protect Plaintiff's and Class members' Personal Information in a manner that complies with applicable laws, regulations, industry standards, and Defendants' respective representations.

111. Defendants' breaches of their respective implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

112. Plaintiff and all other Class members were damaged by Defendants' breaches of their respective implied contracts because: (i) they provided their labor or paid—directly or

through their insurers for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical identity theft-risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their Personal Information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their Personal Information has been breached; (v) they were deprived of the value of their Personal Information; (vi) they lost time and money to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) they provided labor or overpaid for services that were received, without adequate data security.

113. Accordingly, Plaintiff and Class members are entitled to damages, including compensatory, consequential, punitive, and nominal damages, to be determined at trial. Plaintiff and Class members are also entitled to injunctive relief requiring Defendants to (a) strengthen their data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) provide adequate lifetime credit monitoring to Plaintiff and all Class members.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class Against All Defendants)**

114. Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

115. This claim is pleaded in the alternative to the breach of implied contract claim.

116. Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of monies paid for healthcare services or the value of their labor, and through the provision of their Personal Information.

117. Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class members. Defendants also benefitted from the receipt of Plaintiff's and Class members' Personal Information, as this was used to facilitate, *inter alia*, their respective business operations and billing services.

118. As a result of Defendants' conduct, Defendants' patients suffered actual damages in an amount equal to the difference in value between their payments made for services that should have entailed reasonable data privacy and security practices and procedures, and payments made for services without reasonable data privacy and security practices and procedures that they actually received from Defendants.

119. As a result of Defendants' conduct, Baylor Genetics' current and former employees suffered actual damages in an amount equal to the difference in the value of labor they provided with the expectation of reasonable data privacy and security practices and procedures to be used in the course of their employment, and the value of labor that Baylor Genetics' current and former employees actually received without reasonable data privacy and security practices and procedures in place, in the course of their employment with Baylor Genetics.

120. Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the data privacy and security practices and procedures that Plaintiff and Class members paid for or provided labor for, and that were otherwise mandated by federal and state laws, regulations, industry standards, and Defendants' representations.

121. Accordingly, Plaintiff and Class members are entitled to full refunds, restitution, and/or damages from Defendants, and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants as a result of their wrongful conduct. This can be

accomplished by establishing a constructive trust from which Plaintiff and Class members may seek restitution or compensation.

**COUNT VI**
**Violation of New York General Business Law § 349**
**(On Behalf of Plaintiff and the New York Statutory Sub-Class Against All Defendants)**

122. Plaintiff realleges and incorporates by reference each and every preceding paragraph as though fully set forth herein.

123. Plaintiff brings this Count on behalf of herself and the New York Statutory Sub-Class against all Defendants.

124. New York General Business Law § 349(a) provides that "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

125. Defendants Natera and Baylor Genetics are each a "firm, corporation, partnership or association, or agent or employee thereof" withing the meaning of N.Y. Gen. Bus. Law § 349(b).

126. At all relevant times, Defendants were engaged in "business," "trade," or "commerce," or the "furnishing of [] service[s]," within the meaning of N.Y. Gen. Bus. Law § 349(a).

127. Plaintiff and other members of the New York Statutory Sub-Class are "persons" withing the meaning of N.Y. Gen. Bus. Law § 349(h).

128. Defendants, while operating in the State of New York, engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or in furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, including by:

a. Failing to enact adequate privacy and security measures to protect Plaintiff's and the New York Statutory Sub-Class's Personal Information from unauthorized access and disclosure, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable privacy and security risks, remediate those identified risks, and adequately improve privacy and security measures, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the privacy and security of Plaintiff's and the New York Statutory Sub-Class's Personal Information, including, but not limited to, duties imposed by the HIPAA Privacy and Security Rules, HITECH, Section 5 of the FTCA, and New York State's Stop Hacks and Improve Electronic Data Security Act ("SHIELD Act"), which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that Defendants would protect the privacy and confidentiality of Plaintiff's and the New York Statutory Sub-Class's Personal Information, including by implementing and maintaining reasonable data security measures;

e. Misrepresenting that Defendants would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and the New York Statutory Sub-Class's Personal Information, including, but not limited to, duties imposed by the HIPAA Privacy and Security Rules, HITECH, Section 5 of the FTCA, and the SHIELD Act;

f. Failing to disclose the Data Breach to Plaintiff and the New York Statutory Sub-Class in a timely and accurate manner;

g. Omitting, suppressing, and concealing the material fact that Defendants did not reasonably or adequately secure Plaintiff's and the New York Statutory Sub-Class's Personal Information; and

h. Omitting, suppressing and concealing the material fact that Defendants did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and the New York Statutory Sub-Class's Personal Information, including, but not limited to, duties imposed by the HIPAA Privacy and Security Rules, HITECH, Section 5 of the FTCA, and the SHIELD Act.

129. Defendants' representations and omissions were material because they were likely to deceive reasonable patients of the Defendants or current and former employees of Baylor

Genetics about the adequacy of the Defendants' data security and ability to protect the confidentiality of Plaintiff and the New York Statutory Sub-Class's Personal Information.

130. Defendants acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff's and the New York Statutory Sub-Class's rights.

131. As a direct and proximate result of the Defendants' deceptive and unlawful acts and practices, Plaintiff and other members of the New York Statutory Sub-Class have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial and medical accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Personal Information.

132. Defendants' deceptive and unlawful acts and practices complained of herein affected the public interest at large, including the New Yorkers affected by the Data Breach.

133. The above-alleged deceptive and unlawful practices and acts by Defendants caused substantial injury to Plaintiff and other members of the New York Statutory Sub-Class that they could not reasonably avoid.

134. Accordingly, Plaintiff and other members of the New York Statutory Sub-Class seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages (whichever is greater), treble damages, restitution, injunctive relief, and attorneys' fees and costs.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the proposed Class and the New York Statutory Sub-Class, respectfully requests that the Court enter judgment in her favor

and against Defendants as follows:

(A) Certifying the Class and the New York Statutory Sub-Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

(B) Awarding Plaintiff, Class members and the New York Statutory Sub-Class members appropriate monetary remedy, including actual damages, statutory damages, punitive damages, restitution, and disgorgement as may be determined at trial;

(C) Awarding Plaintiff, Class members and the New York Statutory Sub-Class members equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself, the Class, and the New York Statutory Sub-Class seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard Personal Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

(D) Awarding Plaintiff, Class members, and the New York Statutory Sub-Class members pre-judgment and post-judgment interest to the maximum extent allowable under law;

(E) Awarding Plaintiff, Class members, and the New York Statutory Sub-Class members reasonable attorneys' fees, costs and expenses, as allowable; and

(F) Awarding Plaintiff, Class members, and the New York Statutory Sub-Class members such other or further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: October 8, 2026

Respectfully submitted,

*/s/ John S. "Jack" Edwards, Jr.*
**AJAMIE LLP**
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095
Thomas R. Ajamie
Texas Bar No. 00952400
S.D. Tex. No. 6165
Pennzoil Place – South Tower
711 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: (713) 860-1619
Facsimile: (713) 860-1699
jedwards@ajamie.com
tajamie@ajamie.com

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Jack G. Fruchter*
Mitchell M.Z. Twersky*
Lawrence D. Levit*
Tanya Korkhov*
450 Seventh Avenue, 38th Floor
New York, New York 10123
Tel: (212) 279-5050
Fax: (212) 279-3655
jfruchter@aftlaw.com
mtwersky@aftlaw.com
llevit@aftlaw.com
tkorkhov@aftlaw.com

– and –

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Patrice L. Bishop*
9440 Santa Monica Blvd.
Bank of America Building, Suite 301
Beverly Hills, CA 90210
Tel: (310) 279-5125
Fax: (212) 279-3655
pbishop@aftlaw.com

***Counsel for Plaintiff***

**Pro Hac Vice forthcoming*